SARAH LUSA *v.* ROBERT J. GRUNBERG
(AC 27582)

Harper, Lavine and Peters, Js.

Argued March 15—officially released June 19, 2007

*Steven R. Dembo,* with whom, on the brief, was *P. Jo Anne Burgh,* for the appellant (defendant).

*Susan Boyan,* for the appellee (plaintiff).

*Kerry A. Tarpey,* guardian ad litem for the minor children.

*Opinion*

PETERS, J. Pursuant to General Statutes § 46b-215b,[1] in awarding child support, a court must consider and apply statutory child support and arrearage guidelines unless application of the guidelines is inequitable or inappropriate under the circumstances. See *Unkelbach* v. *McNary*, 244 Conn. 350, 372, 710 A.2d 717 (1998). To enter child support orders that deviate from the presumptive support amount, the court must make specific findings on the record to explain its reasons for doing so. Id. In this case, a father claims that the court's order modifying his support obligation must be set aside because of an inconsistency between the court's written articulation and its prior oral statement of the reasons for its order deviating from the support guidelines. Because we do not agree with the father that the oral decision and the articulation are irreconcilable, we affirm the judgment of the trial court.

On April 5, 2006, the plaintiff, Sarah Lusa, filed an amended application for custody of the parties' two minor children. After receipt of individual financial affidavits as required by Practice Book § 25-30 (a) and child support guidelines worksheets in compliance with Practice Book § 25-30 (e) from each parent and after an evidentiary hearing,[2] the trial court issued an oral

---

[1] General Statutes § 46b-215b (a) provides: "The child support guidelines established pursuant to section 46b-215a and in effect on the date of the support determination shall be considered in all determinations of child support amounts, including any past-due support amounts, and payment on arrearages and past-due support within the state. In all such determinations, there shall be a rebuttable presumption that the amount of such awards which resulted from the application of such guidelines is the amount of support, including any past-due support, or payment on any arrearage or past-due support to be ordered. A specific finding on the record that the application of the guidelines would be inequitable or inappropriate in a particular case, as determined under criteria established by the Commission for Child Support Guidelines under section 46b-215a, shall be required in order to rebut the presumption in such case."

[2] The defendant, Robert J. Grunberg; his father, David Grunberg; and the plaintiff were the only witnesses at this hearing.

decision ordering joint custody and ordering the defendant, Robert J. Grunberg, to pay child support in the amount of $600 a week.[3] The defendant filed a motion for articulation, which the court granted by filing a written memorandum of decision that elaborated on the court's decision without changing the amount of the support order. The defendant has appealed.

I

The defendant first claims that the court improperly altered its basis for decision by making a new finding that he owned Bookends 2, LLC (Bookends 2), when the court had made no such finding in its oral decision. The defendant claims that this finding deviated from the finding in the oral decision that he owned a different company, G & S Realty, Inc. (G & S Realty). The defendant argues that by omitting G & S Realty and adding Bookends 2 to its findings, the court improperly altered its reasoning for its award of child support in its articulation. We disagree.

Our review of the court's articulation requires us to construe the judgment of the trial court. "The construction of a judgment is a question of law for the court." (Internal quotation marks omitted.) *Munson* v. *Munson*, 98 Conn. App. 869, 872, 911 A.2d 1158 (2006).

---

[3] The court also ordered the defendant to pay an arrearage in the amount of $120 a week for the period of August 2 until December 23, 2004, ordered both parties to obtain medical insurance for the benefit of the minor children if available through their employers, ordered child support to be paid by wage withholding with payments to be made through the state of Connecticut, forbade both parties from permitting either child to ride on a dirt bike or a motorcycle until the child became eight years old, awarded tax exemptions for both children to the defendant, ordered the defendant to pay the plaintiff's attorney's fees in the amount of $2500 and ordered the defendant to pay the preschool expenses of the older child. The court retained jurisdiction regarding payment of postsecondary educational expenses for the two children. The defendant's appeal has not challenged the validity of any of those orders.

As a general rule, "[a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . An articulation may be necessary where the trial court fails completely to state any basis for its decision . . . or where the basis, although stated, is unclear. . . . The purpose of an articulation is to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Citations omitted; internal quotation marks omitted.) *Fantasia* v. *Milford Fastening Systems*, 86 Conn. App. 270, 283, 860 A.2d 779 (2004), cert. denied, 272 Conn. 919, 866 A.2d 1286 (2005). "An articulation is not an opportunity for a trial court to substitute a new decision nor to change the reasoning or basis of a prior decision." *Koper* v. *Koper*, 17 Conn. App. 480, 484, 553 A.2d 1162 (1989). If, on appeal, this court cannot reconcile an articulation with the original decision, a remand for a new trial is the appropriate remedy. See *Munson* v. *Munson*, supra, 98 Conn. App. 875. Such a remedy, however, is appropriate only when "[t]he crucial findings of fact in the memorandum of decision are inconsistent and irreconcilable, and the articulation obfuscates rather than clarifies the court's reasoning." Id.

A

In our construction of the judgment in this case, we first set forth the oral decision. The trial court stated that it "[found] that the plaintiff [was] generally credible as to her testimony. The defendant and [his father] David Grunberg . . . [were] generally not credible with respect to financial issues to which they testified, more specifically, as to the ownership of the assets and the three family owned businesses.

"The court having heard the testimony, [found] that in March, 2004 . . . David Grunberg transferred to the

defendant a 45 percent interest in . . . three family owned businesses. In exchange for that, the defendant gave back a note in the amount . . . of $500,000 for that 45 percent interest.

"Based on other evidence presented, the court [found that] it is more likely than not that David Grunberg made this transfer at that time in an effort to understate his total assets for purposes of his own divorce, which was held eight days later. Not only did he undervalue the total value of his assets, but he also underestimated the remaining 55 percent of the business, valuing it at less than $200,000, when eight days previously he had sold a smaller portion of the business, 45 percent, for $500,000.

"The court also [found] that both [David] Grunberg's testimony and the defendant's testimony—that the defendant no longer has an ownership interest in the business—[were not] credible. David Grunberg claim[ed] that the defendant could [not] make the monthly payments required by the note. So, on January 1, 2004, the defendant returned his ownership interest [in] the businesses to [David] Grunberg and, in exchange, David Grunberg forgave the note."

The court listed several reasons why it did not find the testimony of the defendant and David Grunberg to be credible and ultimately found that "the defendant presently [did] have a 45 percent ownership interest in at least three businesses: [Bookends], Aircraft Book and News, LLC [Aircraft Book and News], and G & S Realty."

The court then discussed the other reasons why the defendant had "available to him substantial assets over and above his stated weekly income, with which he is able to pay child support." The court indicated that the defendant had supplemented his stated income by selling assets and by receiving money from David

Grunberg. The court noted that the defendant's enhanced income also was evidenced by his ability to purchase a $20,000 Harley Davidson motorcycle by means of an automobile loan.

"The court having reviewed the child support guidelines submitted by the plaintiff, [found] that the income that the plaintiff attributes to the defendant [is] not unreasonable under all of the circumstances . . . ." After noting the limited earnings of the plaintiff, the court found that "there [was] reason to deviate from the child support guidelines on the basis of the substantial disparity in income between the two parties, the fact that the defendant ha[d] substantial assets, as the court has already noted." The court also cited the best interests of the children as another reason to deviate from the presumptive child support award under the guidelines.

The court, for these reasons, ordered the defendant to pay $600 per week in child support. This was a $90 deviation from the amount indicated on the child support guidelines worksheet filed by the plaintiff.

B

To assist our construction of the judgment, we next set forth the relevant portions of the defendant's motion for articulation and the court's written decision. On June 9, 2006, the defendant requested an articulation regarding "whether the court's finding that the defendant holds a [45] percent ownership interest in G & S Realty . . . was, in any way, relevant or material to its determination of the child support award and, if so, the manner in which the court utilized this finding to determine the appropriate amount of support." The defendant also requested that the court articulate "the evidentiary basis for the court's finding that the defendant has a [45] percent ownership interest 'in *at least* three businesses.' " (Emphasis in original.) He

requested specifically that the court "state the other businesses as to which the court finds that the defendant has a [45] percent ownership interest, as well as the evidentiary basis for such finding."

Granting the motion for articulation, the court issued a written memorandum of decision on June 23, 2006. In its written decision, the court reiterated its findings regarding the credibility of the defendant, the plaintiff and David Grunberg.[4] The court then described the evidence that had been presented to it: "The parties filed financial affidavits and child support guidelines worksheets. In addition, [the plaintiff] submitted a written 'summary of [the defendant's] income,' which purported to be a summary of [the plaintiff's] proof.

"For purposes of determining the orders of child support and attorney's fees, the court found the [plaintiff's] financial affidavit to be credible and an accurate statement of her earnings, liabilities and assets. Thus, for purposes of calculating presumptive child support, the court adopted [the plaintiff's] income as set out in her financial affidavit.

"As to [the defendant's] income, the court found that the [defendant's] financial affidavit did not accurately set forth his income, liabilities and assets. In particular, [the defendant] understated his gross income by, at a minimum, (1) failing to include recurrent in-kind compensation received from his employer; (2) failing to include regularly recurring gifts from his father; and (3) failing to include income attributable to his 45 percent ownership interest in two business [Aircraft Book and News and Bookends] and his 100 percent ownership interest in a third business [Bookends 2.] Additionally, [the defendant] failed to list these businesses as assets on his financial affidavit.

---

[4] The court found that the plaintiff was generally credible but found that the defendant and David Grunberg were not.

"As to in-kind compensation, [the defendant] has the use of a 2003 Chevrolet Silverado valued at $30,000. His employer pays the monthly loan payment of $585 and reimburses [the defendant] for the cost of gasoline and maintenance—$60 per week. On his financial affidavit, [the defendant] listed this vehicle as an asset but failed to include his employer's in-kind contribution as income.

"With respect to recurrent gifts and income attributable to [the defendant's] three businesses, it is difficult to precisely calculate these gifts or the income attributable to the businesses. [David] Grunberg testified that in the past several years, he has, on a regular and recurring basis, given [the defendant] lump sum gifts in cash to assist [the defendant] in meeting his expenses. In particular, [David] Grunberg gave [the defendant] $10,000 in cash to cover the period of November 1, 2005, to March 31, 2006. Thus, from that source alone, [the defendant] had available to him $500 per week as income over and above the income which he declared on his financial affidavit. Other evidence showed that [David] Grunberg's gift of $10,000 was not deposited by [the defendant] into his checking account or otherwise converted but was retained by [the defendant] as cash and was used by him to, inter alia, purchase money orders to pay child support and to pay [his] credit card bills.

"Further, during this same period, in addition to the $10,000 retained by [the defendant] as cash and paid out by money orders, [the defendant's] checking account register showed cash deposits averaging $360 per week over and above the [defendant's] deposits of his salary. Notably and, the court believes, intentionally, these two sources of income were omitted by [the defendant] on his financial affidavit. Based on the totality of the evidence, therefore, the court found that the recurrent gifts from [David] Grunberg and the cash deposits into

[the defendant's] checking account were income to the [defendant] for purposes of calculating the presumptive child support."

The court further found that the defendant's weekly expenses were higher than had been reported on his financial affidavit. The court then examined the plaintiff's testimony regarding their lifestyle when she and the defendant lived together. "[The plaintiff] reported that she was not employed when [they] lived together and that [the defendant] paid all of their living expenses, including numerous vacations, shopping trips and trips to casinos. [The plaintiff] testified that at one point, [the defendant] bragged to her that his income was $5000 per week. The court found [the plaintiff] credible in these matters."

After reciting the evidence before the court, the court concluded that "[t]he only reasonable and logical conclusions to be drawn from the evidence presented at the hearing is that [the defendant's] gross and net incomes, as set out in his financial affidavit, grossly understate his true income. For purposes of calculating presumptive child support, the court utilized the findings set out [previously], [the plaintiff's] financial affidavit, [the plaintiff's] written summary of [the defendant's] income and [the plaintiff's] child support guidelines worksheet. Accordingly, the court found [the plaintiff's] net income to be $62 per week, [the defendant's] net income to be $2715 per week and presumptive child support for the parties' two children to be $520 per week. Of this $520, $510 per week is attributable to [the defendant] and $10 per week is attributable to [the plaintiff]."

The court noted the "extraordinary disparity" between the parties' income when addressing the reasons for a deviation. The court also explained that the

defendant's substantial assets, "in the form of a 45 percent ownership in two 'adult' businesses and a 100 percent ownership interest in an Internet 'adult' business," formed an additional basis for the court's deviation from the presumptive child support.

In addition to explaining the history of the transfer of the 45 percent interest in Bookends and Aircraft Book and News, the court found that the defendant's "2005 federal income tax return indicate[d] that [the defendant] is the owner of Bookends 2 . . . . Since no testimony or evidence was adduced that [the defendant] has divested himself of this asset, the court concluded that [the defendant] remain[ed] the owner of this business." The court then concluded that the defendant had $600,000 in assets available to him, which included both his disclosed and undisclosed assets. Finally, the court noted that its deviation from the child support guidelines was in the best interests of the children.

C

Upon careful review of the court's written memorandum of decision, we conclude that the trial court's oral decision and its written articulation are not irreconcilable with regards to the defendant's ownership of G & S Realty and Bookends 2. The defendant specifically had requested the court to articulate whether the finding that he owned G & S Realty was relevant to the award of child support. The court addressed this concern in its articulation. By not referencing G & S Realty in its articulation, the court implied that the defendant's ownership of G & S Realty was not a necessary component of its factual findings.[5]

---

[5] As discussed in part II C, the court had sufficient evidence before it to find, as a matter of fact, that the defendant owned G & S Realty. By not including G & S Realty in its articulation, the court merely indicated that the defendant's possible ownership in that company did not contribute to the court's reasons for deviating from the child support guidelines.

That the court did not consider the ownership of G & S Realty to be material to its award of child support is buttressed by the manner in which the court responded to the defendant's other relevant request to articulate the factual basis for the defendant's 45 percent ownership in "at least three businesses . . . ." In its written memorandum of decision, the court reiterated that it did not find the defendant's and David Grunberg's testimony to be credible regarding the conveyance of Bookends and Aircraft Book and News. The court found, rather, that the defendant had retained the 45 percent interest in each business as evidenced by the written contract and note. The court then specifically addressed the ownership of the third company, Bookends 2, and explained that the source of the finding of ownership was the defendant's 2005 federal income tax forms.

The court's inclusion of Bookends 2 established that the court's finding that the defendant had a substantial ownership in at least three companies was the reason for the deviation. The fact that the court did not precisely identify the third company was not crucial to its finding reason to deviate from the guidelines, especially considering that the court based its decision to deviate from the guidelines on the nearly $500,000 value of Bookends and Aircraft Book and News.

The defendant maintains, nonetheless, that the court's finding that he owned G & S Realty was a crucial component of the court's basis for its decision and that the court's change in its decision after articulation requires a remand for a new hearing under *Munson* v. *Munson*, supra, 98 Conn. App. 875. We do not agree that the ruling in *Munson* applies in this case.

In *Munson*, this court ordered a new child support hearing because the trial court had made inconsistent findings both within the memorandum of decision and between the memorandum of decision and articulation

as to custody of the children. See id. The decision and articulation in *Munson* were irreconcilable because custody of the children was the crucial factor in determining child support. Id.

Unlike the articulation in *Munson*, there is no crucial finding of fact left unresolved or contradicted by the articulation in this case. The court's basis for deviating from the child support guidelines was the defendant's ownership of three businesses. In its articulation, the court could have relied on its original finding that G & S Realty was owned by the defendant. See part II C. The fact that the court, upon a closer review of the record, based its written decision on its finding that the defendant's third company was Bookends 2, instead of G & S Realty, does not change the reasoning of the court's decision. The court simply clarified that Bookends 2, and not G & S Realty, was the third company that the defendant owned.[6]

## II

The defendant's second claim is that the trial court improperly found that the defendant's net weekly income was $2715. According to the defendant, the

[6] Even if we were to construe the judgment in a manner in which the articulation is inconsistent with the original decision, the court's confusion as to the third company can be more readily characterized as a misstatement or clerical error by the court than as an inconsistent decision. "A distinction . . . must be drawn between matters of substance and clerical errors, the distinction being that mere clerical errors may be corrected at any time even after the end of the term. . . . A clerical error does not challenge the court's ability to reach the conclusion that it did reach, but involves the failure to preserve or correctly represent in the record the actual decision of the court. . . . In other words, it is clerical error if the judgment as recorded fails to agree with the judgment in fact rendered . . . ." (Citations omitted; internal quotation marks omitted.) *Maguire* v. *Maguire*, 222 Conn. 32, 39–40, 608 A.2d 79 (1992).

The court's misstatement about the defendant's ownership of the third company was a misstatement that did not affect the substance of its decision. As such, it can be construed as a clerical error that the court could properly correct in its articulation.

court's decision was improper because it was based on improper factual and legal conclusions. The defendant argues, in particular, that the court (1) did not have sufficient evidence to conclude that a $10,000 gift he received from David Grunberg was recurrent in nature, (2) improperly considered the defendant's financial information that the plaintiff included in her worksheet, (3) improperly concluded that the defendant had an ownership interest in G & S Realty and (4) should not have included sales of his personal property as "gross income." We disagree.

A

The defendant's first claim is that the court improperly determined that the $10,000 gift from David Grunberg was part of a pattern of recurrent gifts and therefore properly could be included as part of his gross income. The defendant challenges the court's determination on two grounds. The defendant argues, as a matter of fact, that the court did not have sufficient evidence to make a finding that the $10,000 gift was part of a recurrent pattern of gift giving. The defendant further argues, as a matter of law, that the gift from his father could not be considered as part of his gross income under Connecticut's statutory child support scheme. We are not persuaded.

1

We first review the defendant's claim that the court made an improper factual finding when it determined that the defendant had been receiving recurrent support from his father. "The standard of review in family matters is well settled. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Elia* v. *Elia*, 99 Conn. App. 829, 831, 916 A.2d 845 (2007).

The defendant's claim that there was insufficient evidence to establish a pattern of recurrent gifts from David Grunberg might have been plausible if we viewed this gift in isolation. This individual gift, however, was not the only evidence of David Grunberg's support of the defendant. In addition to the evidence of this $10,000 gift, both the defendant and his father testified that David Grunberg consistently had been supporting the defendant since 2004.[7] This testimony provided the

---

[7] The defendant gave the following testimony regarding the support he received from David Grunberg.

"[The Plaintiff's Counsel]: Have you sought help from your dad financially since you started having children?

"[The Defendant]: Oh, yeah. Definitely.

"[The Plaintiff's Counsel]: Has he given you financial assistance?

"[The Defendant]: Yes.

"[The Plaintiff's Counsel]: Has it been consistent throughout the last two years?

"[The Defendant]: Yes.

"[The Plaintiff's Counsel]: Did he give you—did he give you things before two years ago?

"[The Defendant]: Yeah, but not like he has in the last two years."

David Grunberg gave the following testimony:

"[The Plaintiff's Counsel]: "Okay. And when he had children and his relationship with Sarah wasn't working out, and there was court-ordered support, was he able to pay the support?

"[The Witness]: At times, yes; and at times, no.

"[The Plaintiff's Counsel]: And when he wasn't able to pay the support, did he come to you for help?

"[The Witness]: Absolutely.

"[The Plaintiff's Counsel]: Has he come to you for help in the last two years regarding support payments?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: Have you provided help to him?

"[The Witness]: Yes, I have.

"[The Plaintiff's Counsel]: And in what fashion?

"[The Witness]: Prior to my wife and I—my present wife and I going to Florida, the beginning of November, I had given [the defendant] 10,000 to carry him over a six month period that we were going to be away.

court with a reasonable basis on which to make the factual finding that the $10,000 gift was part of the continuous support that the defendant had been receiving from his father since 2004.[8]

2

We next review the defendant's claim that court drew an improper legal conclusion by interpreting the language of § 46b-215a-1 (11) (B) (v) of the Regulations of Connecticut State Agencies to include gifts from one's parents, such as the gifts David Grunberg made to the defendant, as gross income for purposes of the regulations. "Resolution of this issue requires us to interpret the statutory scheme that governs child support determinations in Connecticut, and, therefore, constitutes a question of law. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . When the question of

---

"[The Plaintiff's Counsel]: And what did you give him the money for?

"[The Witness]: Well, to make whatever his needs arose, you know, payments for child support—whatever he needed to sustain himself.

"[The Plaintiff's Counsel]: And prior to that have you helped him financially?

"[The Witness]: Yeah.

"[The Plaintiff's Counsel]: And I'm talking between 2004 and this past fall?

"[The Witness]: Yes. Nothing—I mean not a large payment like that. No, I didn't give him large, you know, large payments. It was maybe a couple of hundred dollars here and there that he started coming up short with."

[8] As the trier of fact, the court had the duty to draw reasonable inferences from the testimony and other evidence. *Levy, Miller, Maretz, LLC* v. *Vuoso*, 70 Conn. App. 124, 130, 797 A.2d 574 (2002). In addition to the other support that the defendant received from his father, the court properly could have inferred from the testimony that the $10,000 gift was for the purpose of supporting the defendant over a six month period. According to the testimony of the defendant's father, the purpose of the gift was to maintain the defendant over a period of time during which the father would be in Florida. From this testimony, the court reasonably could infer that the gift was part of the father's ongoing support for the defendant.

law involves statutory interpretation, that determination is guided by well settled principles." (Citations omitted; internal quotation marks omitted.) *Unkelbach* v. *McNary*, supra, 244 Conn. 357.

Our interpretation of the statutory scheme that governs child support determinations in Connecticut must begin by ascertaining whether the statute has a plain meaning. General Statutes § 1-2z;[9] see also *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 407–408, 891 A.2d 959 (2006). In our view, the language of the regulations makes it clear that gifts from parents may be included as a part of a party's gross income.

The defendant argues that, because the regulations do not expressly include a gift from one's parents as part of an individual's gross income, we should interpret the regulations to exclude such gifts. The defendant looks for support to the regulations' exclusion of "regularly recurring contributions or gifts of a spouse or domestic partner" from the definition of gross income. Regs., Conn. State Agencies § 46b-215a-1 (11) (B) (v). According to the defendant, the exclusion of gifts as a source of gross income, when they are made by a spouse or domestic partner, require us to exclude similar gifts made by an individual's parents. We are not persuaded by this interpretation of the regulations.

Our regulations define "gross income" as "the average weekly earned and unearned income from all sources before deductions, including but not limited to the items listed in subparagraph (A) of this subdivision, but excluding the items listed in subparagraph (B) of

---

[9] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

this subdivision."[10] Regs., Conn. State Agencies § 46b-215a-1 (11). Although the defendant would have us interpret the list of included items in subparagraph (A) in a restrictive manner that would not encompass a gift from a parent, the phrase "['including but not limited to'] convey[s] a clear intention that the items listed in the definition do not constitute an exhaustive or exclusive list." *State* v. *Jones*, 51 Conn. App. 126, 137, 721 A.2d 903 (1998), cert. denied, 247 Conn. 958, 723 A.2d 814 (1999). "Although 'including' has been found

[10] Section 46b-215a-1 (11) (A) of the Regulations of Connecticut State Agencies provides: "The gross income inclusions are: (i) salary; (ii) hourly wages for regular, overtime and additional employment not to exceed 45 total paid hours per week; (iii) commissions, bonuses and tips; (iv) profit sharing, deferred compensation and severance pay; (v) tribal stipends and incentives; (vi) employment perquisites and in-kind compensation (any basic maintenance or special need such as food, shelter or transportation provided on a recurrent basis in lieu of or in addition to salary or wages); (vii) military personnel fringe benefit payments; (viii) benefits received in place of earned income including, but not limited to, workers' compensation benefits, unemployment insurance benefits, strike pay and disability insurance benefits; (ix) veterans' benefits; (x) social security benefits (excluding Supplemental Security Income [SSI] for a parent or a child), including dependency benefits on the earnings record of an insured parent that are paid on behalf of a child whose support is being determined; (xi) net proceeds from contractual agreements; (xii) pension and retirement income; (xiii) rental income after deduction of reasonable and necessary expenses; (xiv) estate or trust income; (xv) royalties; (xvi) interest, dividends and annuities; (xvii) self-employment earnings, after deduction of all reasonable and necessary business expenses; (xviii) alimony being paid by an individual who is not a party to the support determination; (xix) adoption subsidy benefits received by the custodial parent for the child whose support is being determined; (xx) lottery and gambling winnings, prizes and regularly recurring gifts (except as provided in subparagraph [B] [v] of this subdivision); and (xxi) education grants (including fellowships or subsidies, to the extent taxable as income under the Internal Revenue Code)."

Section 46b-215a-1 (11) (B) of the Regulations of Connecticut State Agencies provides: "The gross income exclusions are: (i) support received on behalf of a child who is living in the home of the parent whose income is being determined; (ii) SSI payments, including those received on behalf of a child who is living in the home of the parent whose income is being determined; (iii) federal, state and local public assistance grants; (iv) earned income tax credit; and (v) the income and regularly recurring contributions or gifts of a spouse or domestic partner."

to be ambiguous by itself, other language may remove the ambiguity, as in this case. . . . By adding the phrase 'but not limited to,' the statute clearly indicates that 'including' is meant as a term of expansion." (Citation omitted.) Id.

We find it significant that the language of subparagraph (A) of § 46b-215a-1 (11), by its use of the phrase "including but not limited to," is expansive in its nature but that the language of subparagraph (B) of § 46b-215a-1 (11), by the absence of such an expanding phrase, is, by its terms, exhaustive. In light of this clear statutory distinction, and bearing in mind the principle that our Supreme Court has "interpreted broadly the definition of gross income contained in the guidelines to include items that, in effect, increase the amount of a parent's income that is available for child support purposes"; *Unkelbach* v. *McNary*, supra, 244 Conn. 360; we conclude that a gift from a parent properly falls under the category of items included as gross income pursuant to § 46b-215a-1 (11) (B) (v) of the Regulations of Connecticut State Agencies.[11]

## B

The defendant next challenges the court's finding regarding his net income on the ground that the child

[11] In *Unkelbach* v. *McNary*, supra, 244 Conn. 350, our Supreme Court addressed the issue of whether gifts from a spouse or domestic partner could be included when calculating gross incomes. At that time of the *Unkelbach* decision, the regulations did not include the exception in (v) for gifts from a spouse or domestic partner. See Regs., Conn. State Agencies (Rev. to 1994) § 46b-215a-1 (11) (B) (v). In interpreting the regulations, our Supreme Court included gifts from third parties as gross income for purposes of child support because the regulations did not "indicate expressly that contributions or gifts from a subsequent spouse, domestic partner, or other third party, are intended to be excluded from gross income under the guidelines." *Unkelbach* v. *McNary*, supra, 360.

In 1999, in response to the *Unkelbach* decision, the regulations were amended expressly to exclude recurrent gifts from a spouse or domestic partner. See *Marrocco* v. *Giardino*, 255 Conn. 617, 637 n.20, 767 A.2d 720 (2001). Gifts from other third parties, however, have not been excluded. See Regs., Conn. State Agencies § 46b-215a-1 (11) (B) (v). This history sup-

support guideline worksheet submitted by the plaintiff was not in evidence. Although the worksheet was not submitted as an exhibit, it was a required submission to the court pursuant to Practice Book § 25-30 (e). The defendant claims that even though the worksheet and attached summary was a required submission by the parties, the court could not properly rely on these documents as evidence because they were merely unsworn representations of counsel. We disagree.

The plaintiff indicated on her worksheet that the defendant's gross weekly income was $2947 and that his net weekly income was $2715. To support this assertion, the plaintiff attached a summary of the defendant's gross weekly income that included (1) the defendant's paycheck from Bookends, (2) other checking account deposits, (3) child support paid with money orders, (4) living expenses paid with cash per financial affidavit, (5) payments made to credit cards not from checkbook, (6) automobile payments made on behalf of the defendant and (7) automobile fuel reimbursements.

The standard of review for a trial court's finding of facts, such as the gross income of the defendant, is whether the finding was clearly erroneous. *Elia* v. *Elia*, supra, 99 Conn. App. 831. "[W]e recognize that the guidelines create a legal presumption as to the amount of child support payments . . . ." *Aley* v. *Aley*, 101 Conn. App. 220, 229, 922 A.2d 184 (2007). We also recognize, however, that "the figures going into that calculation on the worksheet must be based on some underlying evidence." Id. Furthermore, "[i]t is the trier's exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony." (Internal quotation marks omitted.) *Sander* v. *Sander*, 96 Conn. App. 102, 112 n.12, 899 A.2d 670 (2006).

ports our rejection of the expansive reading of subparagraph (B) that the defendant asks us to adopt.

Although the defendant argues that the court could not, as a matter of law, rely solely on the plaintiff's worksheet or attached summary as evidence, because it was a representation of counsel, we need not reach that legal issue in the present case. The items listed in the plaintiff's summary were not merely bald assertions, but rather were substantiated by evidence later produced at trial. As corroborated, the worksheet and the summary, therefore, were properly evidence at trial.

C

The defendant's third claim is that the court made an improper factual finding when it found that the defendant had an ownership interest in G & S Realty. The defendant argues that the court's inclusion of G & S Realty among the companies he owned was not supported by any evidence. According to the defendant, the court's deviation in the child support orders was based, at least in part, on his ownership in this company. The defendant argues that such a finding without support is a ground for reversal. We disagree.

Once again, we review the court's factual findings for clear error. *Elia* v. *Elia*, supra, 99 Conn. App. 831. Our review of the record reveals that there was testimony supporting the court's factual finding that the defendant owned G & S Realty. After testifying that he owned Bookends, Aircraft Book and News and G & S Realty, the defendant's father was asked if, at some point, the defendant had an ownership interest in those businesses. The defendant's father answered, "yes."[12]

---

[12] The following examination of David Grunberg took place:

"[The Plaintiff's Counsel]: Let me go back a step. How many companies do you own?

"[The Witness]: I own several companies, four.

"[The Plaintiff's Counsel]: Okay. Can you list them?

"[The Witness]: Yes. It's Aircraft Book and News, LLC; Bookends, Inc, LLC; G & S Realty, Inc. . . .

"[The Plaintiff's Counsel]: And are you the sole owner of all three of those businesses?

"[The Witness]: Yes.

This testimony provided a sufficient evidentiary basis for the court to make the factual finding that the defendant had an ownership interest in G & S Realty.[13]

In addition, the defendant's testimony, which was given after David Grunberg's testimony, did not shed any light on the question of the defendant's ownership of these businesses. At the hearing, the plaintiff's attorney asked the defendant, "What is your ownership of any of *those* businesses as you sit here today?" (Emphasis added.) In response, the defendant answered, "I don't own anything of *those* three businesses." (Emphasis added.) The plaintiff's attorney then asked the defendant whether he testified about his ownership of those businesses on April 26, 2004. After not being able to recall whether he testified or not, the defendant's memory was refreshed when he was shown the transcript from that date. The defendant then testified, "Yeah, it says of three of them, I'm 45 percent, and the other one, I'm 95 percent." Significantly, the defendant never referred to any of these businesses by name during his testimony.

In light of David Grunberg's affirmative response to the question of whether the defendant owned three businesses, including G & S Realty, and the ambiguous reference to the businesses during the defendant's testimony, the court had an adequate evidentiary basis on

---

"[The Plaintiff's Counsel]: At some point—and as you sit here now—your son has no ownership interest in those businesses?

"[The Witness]: No.

"[The Plaintiff's Counsel]: Okay. At some point, did he?

"[The Witness]: Yes."

[13] We note that the proper remedy in a situation where the record is ambiguous is a motion for articulation, which the defendant asked for in this case. Although the court ultimately abandoned its factual finding in its articulation; see part I; it was not clear error for the court to find in its oral decision that the defendant owned G & S Realty, especially considering the testimony of the defendant's father.

which to find that the defendant had an ownership interest in all three businesses named by David Grunberg.

## D

The defendant's final claim is that the trial court improperly interpreted § 46b-215a-1 (11) (A) of the Regulations of Connecticut State Agencies to include the sale of personal property. The defendant argues that because the sale of personal property is not specifically listed as an item in subparagraph (A), proceeds from such sale could not be used in calculating his gross income. We disagree.

Our review of the court's interpretation of the § 46b-215a-1 (11) (A) of the Regulations of Connecticut State Agencies is plenary. See *Unkelbach* v. *McNary*, supra, 244 Conn. 357. Contrary to the defendant's assertion, § 46b-215a-1 (11) (A) includes an item that encompasses, by its plain meaning, the sale of personal property. Section 46b-215a-1 (11) (A) (xi) of the Regulations of Connecticut State Agencies specifically includes the "net proceeds from contractual agreements" as part of the definition of gross income. The sale of personal property, by its nature, stems from contractual agreements that yield a net proceed. We conclude that the court properly included the net proceeds from the sale of the defendant's property when calculating the defendant's gross income.

The judgment is affirmed.

In this opinion the other judges concurred.